# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

ROBERT DAWDY, JR.,

          Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.

No. C10-4063-MWB

**REPORT AND RECOMMENDATION**

---

## *Introduction*

The plaintiff, Robert Dawdy, Jr., seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Dawdy contends that the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that he is not disabled. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and this case remanded for further proceedings.

## *Background*

Dawdy was born in 1963, has a GED, and previously worked as a restaurant cook and telephone solicitor. AR 116, 332, 593, 609. On March 9 and August 16, 2005, Dawdy applied for DIB and SSI, alleging disability beginning on December 15, 2002 (later amended to March 1, 2005), due to seizures. AR 14, 86-90, 219, 223, 586-91, 603. The Commissioner denied Dawdy's applications initially and again on reconsideration; consequently, Dawdy requested a hearing before an Administrative Law Judge ("ALJ").

AR 50-61.  On March 17, 2008, ALJ Jan Dutton held a hearing in which Dawdy and a vocational expert ("VE") testified.  AR 599-634.  On June 4, 2008, the ALJ issued a decision finding Dawdy not disabled since the alleged onset date of disability of March 1, 2005.  AR 11-23.  Dawdy sought review of this decision by the Appeals Council, which denied review on May 14, 2010.  AR 7-10.  The ALJ's decision thus became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

On July 13, 2010, Dawdy filed a complaint in this court seeking review of the ALJ's decision.  This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case.  The parties have briefed the issues, and the matter is now fully submitted.

### *Summary of Evidence*

Unless otherwise noted below, the court will review the record from Dawdy's alleged onset date of disability of March 1, 2005.  *See Dipple v. Astrue*, 601 F.3d 833, 834 (8th Cir. 2010) (relevant period is from claimant's alleged disability onset date).

### A.   *St. Luke's Regional Medical Center*

On November 23, 2004, Dawdy was admitted to St. Luke's Regional Medical Center after attempting to commit suicide by overdosing on phenobarbital.  AR 457-78.  Dawdy reported to Blanca Marky, M.D., that "he has been having complex partial seizures since he was 18 years old.  He does not know why they started, and nothing has ever been found."  AR 462.  Dr. Marky noted that Dawdy "has a very important history of drug abuse with acid, marijuana and cocaine.  Apparently, at the time the seizures started, he was doing a lot of acid."  AR 462.

Dawdy's medications at the time included Levoxyl for hypothyroidism and Tegretol (carbamazepine) and phenobarbital for his seizures.  AR 466.  Dr. Marky changed his

medications, discontinuing his phenobarbital and resuming his Tegretol medication. AR 457, 464. Dawdy reported to Rodney Dean, M.D., a psychiatrist, that, although he had used "all sorts of drugs," including amphetamines and cocaine, marijuana was "the primary drug that he uses currently." AR 466. His drug screen was positive for carbamazepine, phenobarbital, cannabinoids, and amphetamines. AR 459, 463.

## B.   *Rodney Dean, M.D.*

In response to the Iowa Disability Determination Services Bureau's request for information about Dawdy's medical condition since 2003, on April 29, 2005, Dr. Dean stated as follows:

> I must state at the onset that I only met Mr. Dawdy on one occasion. He was hospitalized at St. Luke's Regional Medical Center in Sioux City on the night of the 23rd of November 2004. I was asked to see him as an on-call psychiatrist for an emergency consultation on the 24th of November 2004 and this is the only interaction that I've had with the patient. . . .
>
> As you can see from my consult, the patient was mainly there because of an overdose of medications. He was given a diagnosis of Major Depressive Disorder, Cannabis Dependence and Polysubstance Dependence. He does have a chronic history of seizure disorder and other medical problems such as Hypothyroidism and a chronically dislocating left shoulder. I placed the patient on Zoloft 50 mg in the morning. He was to see one of the local neurologists in regard to his seizure disorder. You've mentioned in your paperwork a diagnosis of Tourette's Disorder and I'm certainly not aware of that condition. The prognosis for this gentleman was really poor mainly because he has been in correctional facilities most of his life so his ability to function in the local community has really been limited. Since I've only seen him the one occasion it's impossible for me to determine his response to treatment just to state that when he was in the hospital things got bettter in terms of him not being acutely suicidal when he left in a couple of days or so.
>
> In terms of his physical limitations I can tell you that his chronically dislocating shoulder was a problem[] for several reasons. His seizures have never been under control and this is why he's going to see the local neurologist. He has no funds to purchase his medication so he would

3

frequently have seizures, fall, redislocate his shoulder to the point where it would just fall out of the socket without him even doing anything. It was I that actually contacted the University of Iowa to try to get him through the indigent program to see one of the orthopedic shoulder specialists and I don't know where that process is at this point in time because the patient never followed back up with me. So from a physical standpoint he currently has treatment resistant seizures where he's having seizures at least on a weekly basis and they are unable to be controlled with medications plus even the medicines he's used he doesn't have the money to purchase them and this dislocated shoulder is also a problem.

He has limited ability to understand instructions, procedures, and locations and this is partly because of his eighth grade education, the fact that he's been incarcerated most of his adult life and he just has limited occupational/vocational skills. There is no problem with his memory. However, his ability to maintain attention span and concentration is reduced for two reasons. First of all, his seizure medicines really make him tired and sleepy and this is one of the frustrations that drove him to the overdose. Secondly, when he left the hospital he was still depressed although not needing acute in-patient psychiatric care. He has had no positive history of interacting with supervisors, co-workers or the public as again he has spent most of his time incarcerated and certainly does not use good judgment nor has he responded to changes in his work place and because of his past substance abuse history I certainly would not see him as somebody who would effectively handle his own cash benefits.

AR 479-80.

## C.   *Work Performance Assessment of Plaintiff's Previous Employer*

On May 7, 2005, Dawdy's previous employer completed an assessment of his work performance, noting that he had worked as a cook from August 2003 to February 2005. AR 246-47. Dawdy's employer noted that (1) his ability to understand and carry out simple and complex or detailed instructions and procedures was "poor"; (2) his ability to concentrate and remain on task, to adapt to changes in the workplace, and to manage workplace and personal stress while working was "adequate"; (3) his ability to follow rules, to use good judgment, and to relate to supervisors, coworkers, and the public was

"good"; and (4) his ability to adhere to schedules (including attendance) and to maintain his general appearance was "excellent." AR 246. The employer indicated that Dawdy was no longer employed because of "job performance," but indicated that it would rehire Dawdy. AR 247.

### D.   Michael Baker, Ph.D.

On September 15, 2005, Michael Baker, Ph.D., a licensed psychologist, performed a consultative examination of Dawdy at the request of Disability Determination Services. AR 518-21. Dr. Baker noted as follows:

> Mr. Dawdy stated he is applying for disability due to having "uncontrolled seizures." He stated he has experienced these for 21 years and he also has "mental health issues – like last November, a suicide attempt." He reported having overdosed on Phenobarbital and was found by his sister, who is his physician's nurse and lived with him. He was taken to a hospital where he remained for a couple [of] days. He stated he was discharged from the hospital early because it was Thanksgiving and he requested that he be allowed to go home to cook dinner for his extended family. He has been employed as a cook, though "doctors now don't want me to cook until I've been seizure free for six months because I might fall into the grease." He reported having petit mal seizures where he will "jump and splash the grease, and I've got burns all over my arms." He has been told by physicians that he may have Tourette's. This leads to the onset of seizures. He may experience episodes as much as "40 times a day." He reported around the time of his suicide attempt that "I got tired of living like that. Sometimes waking up and not knowing where I'm at." . . .
>
>          . . . .
>
> Mr. Dawdy stated psychiatric involvement other than last November was through Oakdale  for an evaluation. He has been in [chemical dependency] treatment "four or five times." This included Synergy in 1995 or 1996 and previously through CMHI in the '80s. He reported not having used his main drug of choice, marijuana, for over a year. He continued drinking minimally until prescribed Depakote recently. He stated he can no longer drink, nor "do I like to drink anyway." . . . He had been prescribed Zoloft after last November, but did not continue taking it since "I can barely

walk straight as it is." The client presently lives with his father "in the basement," and an uncle lives upstairs. The client's girlfriend stays there "whenever" and she is on SSI for "being deaf."

Mr. Dawdy stated he normally goes to bed around midnight with about one hour sleep onset. He arises between 9:00 and 10:00 a.m. and then will "find something to eat, maybe work on the deck or the yard, play my drums, fix dinner or a sandwich, and then watch TV until I fall asleep." He reported he does chores such as laundry and dishes. He does grocery shopping with food stamps and his father gives him a ride. . . . He does little socially, either spending time in the basement or in the yard doing work. He does not drive.

AR 518-20.

Dr. Baker's examination of Dawdy's mental status revealed the following:

Hygiene appeared adequately maintained. . . . Eye contact was good. He did present with a flat affect. At times her responded very slowly and seemed easily confused. He stated directly that "the Depakote makes me slower." He was able to produce serial sevens at a fair rate without error. General fund of information is adequate. He had to correct himself on arithmetic items offered, but calculations were then correct. Responses to judgment items were fair. . . . His speech was slow and at times difficult to follow. No actual delusional thought content was noted. The client denied present suicidal ideation, though he has had some since the suicide attempt, without planning. He denied hallucinatory experiences in regards to hearing voices. . . . The client reported his energy level as "if I get up and move around, then maybe it's okay, but lots of times I just feel like sitting." . . . The client only recalled only one of four [items] after five minutes.

AR 520.

Dr. Baker concluded as follows:

Mr. Dawdy would seem able to handle cash benefits. Past substance abuse, though reported to not be the case presently, should be checked on in regards to handling cash benefits. While intellectually he is in the low average range, his ability to understand instructions, procedures and locations is affected by lack of academic achievement. Past report by Dr.

6

> Dean suggests that medication has further effect on maintaining adequate attention and concentration.  He does appear depressed and this further affects cognitive functioning.  He reported a history indicative of difficulty interacting with supervisors, coworkers and the public.

AR 521.

Dr. Baker's diagnoses included recurrent depressive disorder, polysubstance dependence in reported early partial remission, and a GAF score of 45.[1]  AR 521.

### E.      State Agency Medical Consultants

On June 13, 2005, Myrna Tashner, Ed.D., a state agency medical consultant, completed a psychiatric review technique form (AR 361-75) in which she cited insufficient evidence of Dawdy's mental impairment because of a lack of information regarding his activities of daily living.  AR 361, 373.

On October 10, 2005, Rhonda Lovell, Ph.D., another state agency medical consultant, completed a psychiatric review technique form (AR 376-89) in which she opined that Dawdy's mental impairment caused him to experience (1) mild restriction in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) one or two episodes of decompensation of extended duration.  AR 386.

Dr. Lovell also assessed Dawdy's mental residual functional capacity ("RFC") (AR 390-94) and opined that he was moderately limited in his ability to (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and

---

[1] The GAF, or global assessment of functioning, scale rates psychological, social, and occupational functioning; it is divided into ten ranges of functioning.  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. text rev. 2000).  A GAF rating between 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.* at 34; *see also Martise v. Astrue*, 641 F.3d 909, 917 n.5 (8th Cir. 2011).

to perform at a consistent pace without an unreasonable number and length of rest periods; (4) accept instruction and respond appropriately to criticism from supervisors; (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (6) respond appropriately to changes in the work setting.  AR 390-91.  Dawdy was not otherwise significantly limited.  AR 390-91.  Dr. Lovell also found as follows:

> The claimant's allegations are partially supported by the medical record with no specific credibility concerns identified.  The claimant was hospitalized for a suicide attempt in 11/04 but did not continue to take antidepressant medications or receive regular medical treatment after his hospitalization.  At [a consultative examination] on 9/15/05, the claimant presented with appropriate grooming and direct eye contact.  Affect was flat and thinking was slowed at times although he was able to do serial sevens.  [Activities of daily living] include cooking and baking, cleaning, laundry, mowing and some home repairs.  The claimant shops independently, reads, plays drums and guitar, and talks with others.  The claimant's third party reports difficulties with memory and interacting with authority figures.  His treating source indicates slowed thought processes due to depression and medications.  Treating source opinion is consistent with other evidence of record and is given equal weight.

> The claimant appears to have a severe mental impairment that does not meet or equal a referenced listing.  Based on [activities of daily living] and prior work as a cook, the claimant is able to understand and remember instructions and procedures for basic and detailed tasks.  [Activities of daily living] and mental status evaluation support moderate variability of concentration.  The claimant's history and third party report suggest some difficulties interacting appropriately with authority figures.  Based on [activities of daily living] and treatment history, the claimant's disorders moderately impact his ability to regularly complete a typical work week.  This assessment is consistent with the evidence of record.  The findings complete the medical portion of the disability determination.

AR 394.

On October 20, 2005, another state agency medical consultant, Jan Hunter, D.O., assessed Dawdy's physical RFC.  AR 395-402A.  Dr. Hunter opined that Dawdy had no

exertional, postural, manipulative, visual, or communicative limitations.  AR 397-400.
Because of Dawdy's history of seizure disorder, he was to avoid concentrated exposure to
hazards such as machinery and heights.  AR 400.  Dr. Hunter noted as follows:

> Current information shows treatment for seizure disorder.  As of 8/16/05,
> he had not had a seizure in two weeks and it appeared that the medication
> was helping control the seizures.  His drug levels have been a little above the
> therapeutic level.  There have been no ER visits recently for seizure activity.
> A [note] dated 3/11/05 stated that the [claimant] had not been [seen] for
> seizures since 11/2004.  He had hernia repair in 4/2005 with no complaint
> of ongoing problems.  The [claimant] has had a [history] of noncompliance
> with his seizure disorder (i.e. on 3/11/05, he was having seizures, at which
> time it was noted that he had stopped taking his [medications].   The
> credibility of the allegations is eroded by the [claimant's] lack of ongoing
> treatment and his history of noncompliance.  It appears that [the seizures]
> remain better controlled with medication.  He has not required ongoing ER
> visits for seizures.  [Claimant] is capable of activities as outlined.

AR 397-98.

## F.   *Siouxland Community Health Center*

On March 11, 2005, Dawdy visited Siouxland Community Health Center for
reportedly "having seizures."  AR 486, 491.  "He has run out of his Levoxyl.  He has
been taking his Tegretol.  They stopped his Phenobarb."  AR 486, 491.  Dawdy's
treatment note reflects that he had "not been seen since he was in the hospital in
November" 2004.  AR 486, 491.  "He has not gone up on his Tegretol.  We are going to
increase it and go up to 500 mg three times a day, like Dr. Marky recommended.  We may
need to add a second agent, but we are going to go along with her recommendation to
leave him off his Phenobarb."  AR 486, 491.

On April 13, 2005, Dawdy underwent repair of a right inguinal hernia.  AR 488.

On July 21, 2005, Dawdy visited the health center, reporting that he was
"continuing to have breakthrough seizures.  He is in the middle of doing something and
then it is like he spaces out.  He also had two big grand [sic] mal seizures another day."

9

AR 486.  A prescription for 250 mg of Depakote once a day was added, and Dawdy "was warned not to drive for six months, per Iowa law, but he knew that already."  AR 486.

On August 2, 2005, Dawdy's dosage of Tegretol was lowered from 1,000 mg to 800 mg, and his prescribed Depakote was increased to twice a day.  AR 483.  On August 16, 2005, Dawdy reported that he "hasn't had a seizure in about 2 weeks" after his seizure medications were adjusted.  AR 483.

On March 31, 2006, Dawdy saw Jonathan Taylor, D.O., complaining of experiencing a seizure within the past week and a half, after being "off the Depakote." AR 547.  According to Dawdy, "[h]e partied the other day and had crank, marijuana and alcohol.  He didn't seize at that time.  He thinks his seizure was triggered by stress."  AR 547.

On July 25, 2006, Dawdy reported having a seizure the previous day and that his "current anti-seizure medication . . . is not as effective as his old one with Phenobarbital included."  AR 546-47.  "Normal gross and fine motor coordination, sensory and motor function, cognitive function, balance and gait" were noted.  AR 546.

On August 8, 2006, Dr. Taylor noted that Dawdy had "been switched off Depakote to Phenobarbital.  He generally has less seizures on the Phenobarbital.  He is also on his Synthroid and Carbamazepine," and was in no acute distress.  AR 545A.  Dr. Taylor also noted: "At this point, I think will [sic] stay on the Phenobarbital as it's helping him some. He can't drive.  There are issues about work.  He was a cook and I don't know if working around hot grease or a burning stove would be the best for him.  I would probably have him stay off ladders and might consider retraining in sedentary work."  AR 545A.

On October 10, 2006, Dawdy reported having a seizure in the last two to three days and biting his tongue.  AR 545, 546.

On October 31, 2006, Dawdy reportedly had a seizure on the previous Sunday. According to Dawdy, he "will go from a few seizures a day to going for a couple [of]

10

months without a seizure.  He thinks he hurt his back.  Not quite sure if it was the fall.
His family member caught him.  He did not hit his head.  The seizure lasted for a minute.
No bowel or bladder incontinence with it.  If he goes up to the high dose on his Tegretol,
he will get lightheaded and not feel well so he is only taking that twice a day instead of
three times a day." AR 543.

On January 16, 2007, Dawdy obtained from Siouxland Community Health Center
his prescribed medication of Vicodin and Flexeril.  AR 543.

On January 22, 2007, Dawdy complained of back pain after having fallen and hit
his head on January 15.  Dr. Taylor recommended 1,000 mg of Tylenol and warm baths
and gentle stretches.  AR 541.

On February 12, 2007, Dawdy visited the health center requesting a note stating his
medications for his seizure disorder after he had been stopped by the police while driving
and had not able to "stand up straight."  AR 541.  Dr. Taylor declined to do so, as his
medication and seizure disorder "would not cause unsteadiness."  AR 541.  Ultimately,
the health center provided Dawdy a list of his diagnoses and medications after he signed
a release.  AR 540.

On May 13, 2007, Dawdy was involved in a motor vehicle accident as a passenger
and sustained a fractured sternum and contusion of his ribs.  AR 535, 537-40.  In a follow-
up visit on May 22, 2007, Dr. Taylor noted that Dawdy had not had a recent seizure.
"His medications are going well there."  AR 536.

On June 3, 2007, Dawdy had a seizure and fell while taking a shower at home,
causing pain in his left knee.  AR 534.  On June 12, 2007, Dawdy complained of lingering
right wrist pain from the motor vehicle accident.  AR 532-33.  An MRI revealed two
possible fractured bones in Dawdy's right wrist and "a medial meniscal degenerative area"
in his left knee, so Dr. Taylor prescribed a splint for Dawdy's right wrist.  AR 529.

Dawdy was "worried because he needs to play in his band with the drums in 2 weeks." AR 529.

On June 20, 2007, Dr. Taylor removed Dawdy's splint and noted that he had not had a seizure in three weeks. AR 528. Dr. Taylor recommended that Dawdy not play the drums for at least a month. AR 528.

On July 17, 2007, Dawdy reported to Dr. Taylor that his right wrist was feeling better and that he was "starting to play his drums again, but not a full time line as he used to." AR 526. Dr. Taylor noted that Dawdy had not had a seizure in five weeks, but was "running low on the medicine" and needed refills. AR 526.

On August 27, 2007, Dawdy saw Dr. Taylor for a release to return to work. AR 524-25. Dawdy's rib and right wrist fractures were significantly improved, and Dr. Taylor opined that "[i]t is okay for him to work 100% and still have to do exercises for his right wrist."

On April 8, 2008, Dr. Taylor noted in written responses to questions by Dawdy's attorney that he provided medication for Dawdy's generalized seizure disorder and hypothyroidism, and opined that Dawdy's prognosis was "most likely poor at this time." AR 576. According to Dr. Taylor, Dawdy's reports of being incoherent for "several hours" after experiencing a seizure were "absolutely" consistent with his condition, but Dr. Taylor was "not sure" whether Dawdy would be incoherent for "days" afterward, "as he could have repetitive seizures." AR 576. Dr. Taylor also believed that "it is likely that Mr. Dawdy would be required to leave work without notice if he had a seizure during the work day" and that "he would be likely to miss two or more days of work per month on an unscheduled basis." AR 576-77. Regarding work restrictions, Dr. Taylor had advised Dawdy to avoid heights, manual labor, driving, and the operation of heavy equipment. AR 577. Dr. Taylor did not believe that Dawdy's prior history of polysubstance abuse had any effect on his seizure disorder, as he "had not used illicit [drugs] since 2003." AR 577.

12

When asked whether he believed that Dawdy was an appropriate candidate for Social Security disability benefits, Dr. Taylor stated that he was "not a disability doctor, but would generally agree with this."  AR 577.

### G.    Angela Stokes, Ph.D.

On March 14, 21, and 24, 2007, Angela Stokes, Ph.D., a licensed clinical psychologist, evaluated Dawdy's competency to stand trial after being charged with possession of a controlled substance in March 2006.  AR 549-56.  She noted that Dawdy "is currently divorced and in a relationship.  His current partner has one son who he is close to.  Mr. Dawdy enjoys spending time with the son, attending his sporting events and school activities."  AR 551.  Dr. Stokes also noted the following:

> Mr. Dawdy believes that he began having seizures around the age of nineteen.  He was able to work as a cook for a period of about two to three years but, given his seizure disorder, could not return to employment of this nature for fear that he could "fall into the grease."  He has only had sporadic work over the past 20 years.  Currently he lives with his father and plays the drums in a local band.  They have produced several CD's.

AR 551.

Dr. Stokes's diagnoses in her report on March 30, 2007, included recurrent, major depressive disorder; polysubstance dependence; seizure disorder; and a GAF score of 45.  AR 555-56.  Dr. Stokes summarized her findings as follows:

> Mr. Dawdy's fears of a conspiracy against him is interfering in his ability to communicate with his attorney at this time and his decisions in his case appear to be based on his fear and paranoia that he is being set up.  An example of this is his refusal to consider a plea agreement as he does not trust the terms of the agreement.  In terms of evidence, the original tape in his case is missing, and there have been edits to the tape.  These events have only served to increase his distrust in terms of getting a fair trial.  He believes that the County Attorney's office and the arresting officer as well as the Public Defender's office are conspiring against him to take "my life away."  He believes that he needs a change of venue in order to get a fair trial and wants [no one] on his case who has any connection to the County

13

Attorney's office or the Public Defender's office. [His] capacity to disclose to his attorney relevant facts and to testify relevantly is questionable at this time. He does have a basic understanding of a trial process.

He does have a long standing history of memory difficulties and does experience perceived lapses of time and may therefore not be able to process and recall events from one day to the next. It is not likely that medical referral and treatment will remediate his anxiety and fearfulness regarding his case. He shows some cognitive deficits that are likely related to his seizure condition and to effects of medication. These deficits are likely longstanding and chronic and unlikely to change.

At this time, he remains at high risk for further harm to himself and to others, given his high level of anxiety, and feelings of paranoia as well as his anger towards the injustices he believes he has experienced. There is a good chance that he could retaliate out of frustration if his case continues to proceed in a way that he perceives is prejudicial against him. A medical referral is warranted for treatment of depressive and anxious symptoms.

AR 556.

## H.    *Siouxland Mental Health Center*

Between November 2007 and April 2008, Dawdy underwent court-ordered therapy at the Siouxland Mental Health Center in connection with his pending criminal charges. AR 557-67. On November 29, 2007, Wade Kuehl, a licensed social worker, evaluated Dawdy's mental status and social history. AR 566-67. Dawdy "noted that he has been found 'incompetent to stand trial.'" AR 566. Mr. Kuehl remarked that Dawdy "may be a poor historian and his reliability is uncertain." AR 566. Dawdy reported to Mr. Kuehl that "he has charges pending against him but he has been found to be incompetent to stand trial. . . . He noted that he has been dealing with the legal issue for 2 years. He said there is some type of drug charge against him. He noted that he had legal problems as a younger man. He noted that he had four felonies in the 1980s. He has served 10 and a half years in prison." AR 566. A mental status examination revealed that Dawdy's

concentration was "fair." AR 566. As for Dawdy's memory, "[n]o problems [were] noted," but Mr. Kuehl "suspect[ed] he may have some issues with memory loss." AR 566. Regarding Dawdy's substance abuse history, Mr. Kuehl noted that Dawdy "has been clean and sober since 2002. He noted that he had abused alcohol, meth, cocaine, acid, marijuana, and other drugs. He has completed substance abuse treatment." AR 566. Mr. Kuehl's diagnoses included moderate, recurrent major depressive disorder and a GAF score of 50. AR 567.

On December 7, 2007, another social worker, Keith Sutherland, saw Dawdy and noted:

> At the end of the session [Dawdy] said that he has been court ordered into treatment. Prior to that statement he told of a long history of being targeted by police, being falsely [accused] and physically assaulted including having his shoulder broken by a jailer. . . . [A]s best as I understand it, he is facing several charges and has been offered a plea bargain. He does not want to accept the plea bargain because he believes they won't honor it. He wants to go to trial so he can expose the police but the trial is being postponed indefinitely because the court has determined he is incompetent to stand trial.

AR 565.

On December 17, 2007, Mr. Sutherland reiterated that Dawdy "is court ordered into treatment," but according to Dawdy, Mr. Sutherland was "not the person who will determine whether he becomes able to stand trial. That would have to be determined by those people who have made the evaluation that he is incompetent." AR 564. Accordingly, Mr. Sutherland noted: "Given all this, the question is what will he and I do during therapy?" AR 564.

On January 10, 2008, Mr. Sutherland remarked in his progress note: "To be brutally honest, I'm still not sure what the goal of therapy is for" Dawdy. AR 563. "I still find it curious that the court can determine that he is incompetent to stand trial and then just leave it at that without some kind of disposition." AR 563.

15

On January 24, 2008, Mr. Sutherland "asked [Dawdy] what he thought that his meeting with Angela Stokes contained such that she considered him incompetent to stand trial[.] He said that he didn't trust the police and the correctional system. I told [Dawdy] that he seemed to me to know the difference between right and wrong and I wasn't sure what the reason was that he was deemed incompetent." AR 562.

On February 29, 2008, Mr. Sutherland noted that Dawdy "had a seizure about a week ago from which he still hasn't recovered. He said he doesn't feel like his equilibrium has returned." AR 560.

### Hearing Testimony

#### A.    Plaintiff's Testimony

On September 3, 2005, Dawdy completed a seizure disorder questionnaire (AR 276-77) in which he related that he believed that stress or fatigue caused his seizures to occur, but he also had seizures when he "was just watching TV or talking to someone." AR 276. Most of the time, Dawdy does not know when his seizures are going to happen, but "sometimes I jump. My body jumps or I feel dizzy. Sometimes I feel sick to my stomach." AR 276. He will fall or lose his balance if he is standing when having a seizure. AR 276. A gran mal seizure will last "just a few minutes"; if Dawdy has a small or petit mal seizure, he "will jump for hours." AR 276. After a seizure, he will "curl up like a baby and sleep for a long time. If someone tries to talk to me, I do not know my name or where I am or who is talking to me." AR 276. According to Dawdy, he is able to continue with his regular routine a day after having a seizure; "sometimes I'll know my name and walk to the bathroom after a few hours but go right back to sleep." AR 277. Dawdy's medications, which he took regularly, included carbamazepine and Depakote twice daily. AR 277. According to Dawdy, the frequency of his seizures range from "1 in 2 or 3 months" to "1 or 2 in a week"; he has had two in one day. AR 277.

16

Dawdy testified at the hearing that he was divorced, had two adult daughters, and lived with his girlfriend and her seventeen-year-old son in his father's house. AR 609-11. He previously worked in five to ten restaurants as a cook. AR 612. In explaining his ability to work as a cook with his seizure disorder, Dawdy testified: "Well when I was having bad days, when I was jumping or having, if I would have a seizure, I just hid it the best I could. When they did find out that I had seizures I had lost my job shortly after that." AR 615. According to Dawdy, he was "pretty much" able to keep his condition "disguised for a year and a half" from his employer. AR 615. According to his attorney, Dawdy had not seen a neurologist since 2005 because of "insurance issues and lack of funding." AR 604-05.

According to Dawdy, he rode with his girlfriend or his father if he needed to travel, as he had not driven a motor vehicle since his alleged onset date of disability. AR 616. At home, he sat "at home so much that [he picked] up stuff around the house." AR 617. He no longer smoked marijuana, stating that the last time he did so was before his arrest in March 2006. AR 615, 617. Dawdy testified that he could not return to his previous work as a cook because his "seizures are getting worse and they're getting longer. They went from a minute and a half, two minutes to three and a half, four minutes long of convulsions . . . I don't know my name or where I'm at or nothing for up to days later." AR 618. After experiencing a gran mal seizure, he "will fall into a sleep after that. I might wake up for like a minute and see people around me but I don't know what they're saying and that's for maybe a minute and I'll fall back unconscious and then I'm out for hours and hours." AR 618.

Dawdy testified that he took a combination of phenobarbital and Tegretol for his seizures, and "used to have up to 40 seizures a day." AR 619. Dawdy never had a seizure while at work as a cook, although he "had quite a few seizures" during that time, where he "was still having a couple [of seizures] a month," from "two in a week" to "two

in a day." AR 619.  He could tell that his seizures were becoming stronger because he would be "tired after a seizure for days" and would not "even know [his] name for six or eight hours." AR 622.  According to Dawdy, he has "wandered around" not knowing where he was, and has been arrested for mistaken public intoxication after wandering after a seizure.  AR 622.

The ALJ summarized Dawdy's testimony as follows:

> At the hearing, the claimant testified that he has experienced seizures for 22 years.  He said he could not return to his work as a cook because he has seizures that last for two to four minutes during which he loses consciousness and then is "out for hours and hours." He said he must sleep "for days" following a seizure and that he won't even know his name for six to eight hours after a seizure.  He said he "wanders around" after a seizure and even does so when he has _**not**_ had a seizure.  He said he has been arrested for public intoxication even though he had not been drinking because he did not know his name and could not stand up straight.  He said that, if he goes wandering around, he could wind up in the middle of the street and get hit by a car and not know "where (he) will end up." He said that, even three or four days after his most recent seizure, he remembers having a conversation with his representative but he did not understand what was being said to him.

> The claimant said that he never had a seizure while working at his most recent job as a cook.  He said that, if he had one, he would have "thank(ed) God that he did not fall into a deep fat fryer." He said he was sometimes having as many as 40 seizures a day.

AR 19.

### B.   VE's Testimony

In response to a series of hypothetical questions by the ALJ, the VE testified that Dawdy could not perform his past relevant work as a cook and telephone solicitor if he (1) could not work around ladders, ropes, or scaffolds; (2) could not work with dangerous equipment or machinery "where he could hurt himself if he had a seizure or hurt others"; (3) could reach overhead with his left, non-dominant arm only occasionally; and (4) could

perform only unskilled work that was routine, repetitive, did not require extended concentration or dealing with job changes, and involved only brief or superficial social interaction with co-workers, the general public, and supervisors that was not constant, frequent, or intense.  AR 625-27.

The VE further testified that a person with Dawdy's vocational profile could perform work as a housekeeping cleaner, dishwasher, and office helper.  AR 627-29.  If Dawdy's testimony were considered credible, however, the VE did not believe that he would be able to sustain employment.  AR 630.  The VE explained as follows:

> [Dawdy] indicates that he has these convulsions followed by biting of the mouth, followed by disorientation where he doesn't know his cognitive abilities are messed up for days.  He indicates that sometimes he wakes up in the process of a seizure and is cognizant for a minute and then he falls back into an unconscious state.  He indicated in his testimony that some days, sometimes he, four days later he's still disoriented.  He indicated fatigue after seizures for a long time.  Due to all those things I think it would be difficult for him to sustain activity.

AR 630-31.  According to the VE, the inability to process and recall events from one day to the next would affect adversely an individual's ability to maintain employment.  AR 631.  An individual would be precluded from competitive employment if that individual had to miss work more than two days per month.  AR 631.  According to the VE, an individual with a GAF score of 45 would not be able to sustain employment; "50, 55 is marginal but people can hold a job I believe between 50 and 55 but 50 and below is usually problematic."  AR 632.

## C.    *Lay Witness Testimony*

### 1.    *Robert Dawdy, Sr.*

On August 29, 2005, the plaintiff's father, Robert Dawdy, Sr., completed a third-party function report (AR 268-75) in which he related that his son lives in his basement and "does nothing but sleep for days" whenever he "has a big seizure."  AR 268-69.

19

Although the plaintiff did not need to be reminded to take care of his personal needs and grooming, he needed to be reminded to take his medicine "because he forgets all the time." AR 270. The plaintiff prepares his own meals daily without difficulty, although he "has trouble keeping track of time if he's baking." AR 270. Household chores that the plaintiff can perform include cleaning, laundry, mowing, and some repairs, although the repairs "can take longer" than normal to do. AR 270. The plaintiff "needs to be reminded" and sometimes needs "help with figuring things out." AR 270.

On "most days," the plaintiff goes outside to walk, ride in a car, or ride a bicycle; although he can go out alone, he cannot drive because he "has too many seizures." AR 271. The plaintiff also shops for food in stores "a couple of times a week," but he "takes 2 or 3 times longer than other people." AR 271. According to the plaintiff's father, his son can count change and use a checkbook and money orders, but cannot pay bills or handle a savings account. AR 271. The plaintiff's hobbies include playing drums and guitar, which he does "just once in a while, but he plays well." AR 272. However, he "has petite [sic] [mal] seizures sometimes when he's playing that last for a second or two." AR 272. The plaintiff's social activities include talking to people on the phone and the internet every day, but "he doesn't do anything on a regular basis" and "needs to be reminded of appointments." AR 272. When engaging in outside social activities, the plaintiff needs to be accompanied in case he has a seizure. AR 272.

According to the plaintiff's father, his son's condition affects his memory, understanding, concentration, and ability to follow instructions and to complete tasks. AR 273. The plaintiff can only pay attention for "about a minute" and cannot finish what he starts because he "gets sidetracked easily." AR 273. In attempting to follow spoken instructions, the plaintiff "gets mixed up" and "tries to fill in the spaces" because of "gaps in the instructions." AR 273. The plaintiff "doesn't seem to like authority figures much and sometimes tells them so." AR 274. The plaintiff has been fired or laid off from a job

because he has problems with getting along with other people and "doesn't want to allow people to treat him bad." AR 274. "It sometimes takes [the plaintiff] a while" to handle changes in routine. AR 274.

On August 30, 2005, the plaintiff's father completed a questionnaire about his son's seizure disorder and related that stress or fatigue caused his son's seizures to occur, but "a lot of the time there seems to be no reason. It just happens." AR 266. At times, the plaintiff "seems to know" when his seizures are about to happen, but "it's like trying to guess the weather." AR 266. If the plaintiff is standing when experiencing a seizure, "his body freezes and he usually falls forward, landing on his face." AR 266. According to the plaintiff's father, the seizures "seem to last about five minutes." AR 266. In describing the plaintiff's behavior after a seizure, his father related that he "is totally drained. He seems unconscious. When he is able to talk, he doesn't know anything. He doesn't remember what happened. He can't answer any questions of any kind." AR 266. After a seizure, the plaintiff "can't be left alone for a bit. If he gets up his balance is bad and he doesn't have any idea what he's doing or where he's going," and "usually he sleeps a long time" and is "pretty much done for the day." Although the plaintiff's father did not know the name and dosage of his son's medications, he stated that his son took his medications on a regular basis. AR 267. The plaintiff's father also stated that his son's seizures varied in frequency: "Sometimes it can be month [sic] or more. Sometimes he'll have 2 [gran mal seizures] in 1 day." AR 267.

In lieu of his testimony at the hearing, the plaintiff's father wrote a letter on or about April 14, 2008 (AR 333-35), in which he related that his son had experienced gran mal seizures since he was 19 years old, and also stated as follows:

> Over the years [the seizures] have taken a toll on his thinking process. His ability to reason properly is severely damaged. His memory is almost nonexistent at times. After he's had a seizure he doesn't remember anything for days. It's like his short term memory just doesn't work.

21

To keep his seizures down, his doctor has him so doped up he can't do anything.

Bob has tried to work over and over.  Not being able to keep a job has also taken [its] toll.  I know that he gets awfully depressed and he somehow manages to shake it off and keeps going.

. . . .

. . . He needs to feel like he's worth something in this world.

It's not right to let someone feel like they should be dead.

AR 334-35.

### 2.   *Sherry Saxen*

On March 11, 2008, Sherry Saxen, Dawdy's girlfriend, submitted an affidavit and calendar entries between December 2004 and December 2007 (AR 303-31) where she had marked most of the days when Dawdy had a seizure or was "jumpy."  AR 303.  According to Saxen, "[w]hen he is 'jumpy,' it is like he starts to have a seizure, causing him to drop whatever he may have in his hand."  AR 303.  When Dawdy has a seizure, "he sleeps for an extended period of time because of what he has gone through, and then he is disoriented for a long time after that.  This can last for several hours, or even days."  AR 303.

### Summary of ALJ's Decision

On June 4, 2008, the ALJ found that Dawdy (1) had not engaged in substantial gainful activity since the alleged onset date of disability of March 1, 2005; and (2) had an impairment or a combination of impairments considered to be "severe" on the basis of the requirements in the Code of Federal Regulations; but (3) did not have an impairment or a combination of impairments meeting or equaling one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (4) was unable to perform his past relevant work as a cook and telephone solicitor; but (5) could perform other work in the national

economy such as a housekeeping cleaner, dishwasher, or office helper.  AR 16-22.  The ALJ accordingly found that Dawdy was not disabled from March 1, 2005, through the date of the ALJ's decision.  AR 23.

In so finding, the ALJ found that Dawdy had only a mild restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  AR 18.  Dawdy experienced no episodes of decompensation.  AR 18.  The ALJ thus found that Dawdy's mental impairment did not meet or medically equal the criteria of paragraph B of 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04 ("Listing 12.04").  AR 18.  The ALJ also found that the evidence in the record failed to establish the criteria of paragraph C of Listing 12.04.  AR 18.

The ALJ found that the plaintiff had the RFC to perform medium work, except he could not work around ladders, ropes, scaffolds, or dangerous equipment or machinery. AR 18.  Further, Dawdy could reach only occasionally above his head with his non-dominant left arm, and he was limited to performing routine and repetitive work that did not require extended concentration or dealing with job changes.  AR 19.  He also was limited to performing work that required no more than brief or superficial interaction with co-workers, the general public, or supervisors.  AR 19.

Regarding Dawdy's credibility, the ALJ found that his "medically determinable impairments could reasonably be expected to produce at least some of the alleged symptoms.  However, his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment."  AR 18.

> There are several factors that tend to discredit the claimant's testimony.  Although he testified to unpredictable seizures that thoroughly disrupt his life, he does not even receive any treatment from a neurologist. He testified that he has experienced as many as 40 seizures in a single day. It is unlikely that one would endure the pervasive and troubling symptoms he described and yet not take all reasonable steps to find a medical solution.

The record reflects that he has never described such extreme symptoms to Dr. Taylor, his family doctor.   Therefore, the undersigned finds that it is unlikely that he is actually having those symptoms to that degree.

The undersigned also notes that the claimant did not seek any counseling or psychiatric care until November of 2007 – when he was apparently ordered by a court to do so.   In addition, he takes no medication for any of those problems.   This causes the undersigned to give little weight to the recent written statement of the claimant's father.   He wrote that the claimant "needs to feel like he's worth something in this world."   (It is not clear how the receipt of disability benefits would bring that about.)   He closed his statement by writing that "it's not right to let someone feel like they should be dead."   It is unlikely that the claimant's father would allow him to suffer so and yet not arrange for some sort of treatment that could improve his lot.   Since there is no indication the father has made any such arrangements, the undersigned concludes that he has not accurately stated the claimant's emotional condition.

The claimant gave the impression in his testimony that he rarely leaves his home and then only for medical appointments.   However, he told a consulting psychologist in March of 2007 that he enjoys attending sporting events and school activities in which his girlfriend's son is participating.   He also stated that he plays drums in a local band and has produced several CD's.   He made no mention of that activity in his testimony but it is unlikely that he is doing this from the basement of his father's house (where he lives with his girlfriend and her son).   In addition, he is facing criminal charges for operating a vehicle while impaired and for possession of illicit drugs after being stopped by the police in March of 2006.   In February of 2007, the claimant asked Dr. Taylor for a statement reflecting that his medication and his seizure disorder would account for his inability to "stand up straight" when he was stopped by the police while driving.   The doctor refused to do that since the claimant's condition and medication would "not cause unsteadiness."   (It is not clear if the claimant was seeking this statement to help him respond to the charges pending following his arrest in March of 2006 or for some other similar incident.)

. . . .

24

The claimant told a counselor in November of 2007 that he had been "clean and sober" since 2002. That is clearly in error. The record shows that he had been using several illicit drugs when he was hospitalized in November of 2004 and again in March of 2006.

AR 20-21 (citations omitted).

Regarding the credibility of the evidence produced by Dawdy's girlfriend, the ALJ found as follows:

The claimant's girlfriend purported to maintain a "log" by making notations on a calendar whenever the claimant had a seizure or was "jumpy." When one compares her notations with the other evidence in the record regarding his seizures, it is clear that her "log" is unreliable. For example, on July 25, 2006 the claimant told Dr. Taylor he had a seizure the preceding day. However, the calendar shows seizures on July 22 and July 31 – but not on July 24. On October 10, 2006, the claimant said he had a seizure two or three days earlier. However, the calendar shows only a single seizure in October of 2006 – on October 22. On October 31, 2006, the claimant said he had a seizure the preceding Sunday. (That was October 29.) However, the calendar does not reflect a seizure that day but, instead, shows a seizure a week earlier. On June 6, 2007, the claimant told the doctor he had a seizure at 12:30 on Sunday June 3, 2007. However, the [log] erroneously reflects that he was "jumpy" on June 2 but does not indicate any seizure activity on June 3, 2007.

In short, that "log" appears to be so contrary to actual events that the undersigned questions the motivation behind its submission.

AR 21 (citations omitted).

The ALJ also considered Dr. Taylor's opinion and stated the following:

As for the opinion evidence, Dr. Taylor has recently submitted brief responses to the questions put to him by the claimant's representative regarding his medical condition. He stated that incoherence for several hours following a seizure is "absolutely" possible. However, he seemed to find the claimant's testimony that he is incoherent for "days" after a seizure to be unlikely. Dr. Taylor erroneously concluded that the claimant had not used illicit drugs since 2003. (Again, there is persuasive evidence in the record that he used them in at least November of 2004 and March of 2006.)

He also stated his opinion that the claimant should avoid work which would expose him to danger if [he] were to have a seizure – such as operating heavy equipment or driving or working at a height where a fall would cause severe injury.  Of course, this is consistent with the limitations identified by the undersigned in [the ALJ's RFC assessment].

AR 21.

### *Disability Determinations and the Burden of Proof*

The Social Security Act defines a disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."  *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).  "An impairment is

not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined

27

wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at step four, age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion

to prove disability remains on the claimant.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards and whether the factual findings are supported by substantial evidence on the record as a whole.  *Page*, 484 F.3d at 1042.  This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole."  *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.  *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010); *see Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that supports the Commissioner's decision as well as the evidence that detracts from it."  *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)).  The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial."  *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence.  *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989).   The court, however, does not

"reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch*, 547 F.3d at 935). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## Discussion

**A.    The ALJ's Credibility Determinations**

### 1.    Plaintiff's Credibility

Because of his inability to afford treatment and medications, Dawdy maintains that the ALJ erred in discounting his credibility on the basis of his failure to seek treatment. Doc. No. 13 at 17. He also contends that the ALJ failed to develop the record by "sandbagging" him at the hearing "by asking him a vague question about his activities, and then failed to ask him follow-up questions about the activities [the ALJ] found in the records which she used against him." *Id.* at 18; Doc. No. 21 at 1-2. He further asserts that the ALJ erroneously discounted the credibility of his father and his girlfriend. Doc. No. 13 at 18. The Commissioner maintains that Dawdy's noncompliance with treatment

and the inconsistencies between the record evidence and the testimony of Dawdy and his girlfriend were appropriate reasons to find their testimony not credible.  Doc. No. 19 at 13-19.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  In this regard, an ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole.  *Id.*  When evaluating a claimant's subjective complaints, the ALJ must consider 1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii) (codifying *Polaski* factors).  Other factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints.  *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010).  Thus, although an ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence, *Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010), such evidence is one factor that the ALJ may consider.  *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008); *see Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (noting that an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary).  Further, an ALJ need not explicitly discuss each *Polaski* factor; it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints.  *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009); *see Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ

discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

In assessing Dawdy's credibility, the ALJ first acknowledged the above factors. AR 19 (citing 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Ruling 96-7p). The ALJ then pointed to the lack of objective medical evidence in discounting Dawdy's subjective complaints. AR 19-21.

The ALJ discredited Dawdy's testimony because, although he claimed to suffer from unpredictable, disruptive seizures, he did not receive treatment from a neurologist. AR 20. The ALJ further noted that Dawdy "did not seek any counseling or psychiatric care until November of 2007 – when he was apparently ordered by a court to do so." AR 20. Dawdy contends that he could not afford such care. Doc. No. 13 at 17. "It is for the ALJ in the first instance to determine [the claimant's] motivation for failing to follow prescribed treatment or seek medical attention." *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989) (citing *Benskin v. Bowen*, 830 F.2d 878, 884 n.1 (8th Cir. 1987)). A claimant's failure to seek regular medical treatment is inconsistent with complaints of disabling pain. *Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996); *see also* 20 C.F.R. §§ 404.1529(c)(3)(v), 416.929(c)(3)(v) (factors relevant to claimant's symptoms that Commissioner considers include treatment, other than medication, that claimant receives or has received for relief of claimant's pain or other symptoms). "Economic justifications for the lack of treatment can be relevant to a disability determination," *Clark v. Shalala*, 28 F.3d 828, 831 n.4 (8th Cir. 1994), although financial strain is not determinative in determining whether to award a claimant benefits. *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992).

In this case, although a "lack of financial resources may in some cases justify the failure to seek medical attention" or to follow prescribed treatment, *Johnson*, 866 F.2d at 275, Dawdy points to "no evidence [he] was ever denied medical treatment due to financial

32

reasons." *Goff*, 421 F.3d at 793.  Rather, the record indicates that, even before his alleged onset date of disability, Dawdy received medication for his seizure disorder, including carbamazepine and phenobarbital.  AR 466.  After his suicide attempt in November 2004, Dawdy obtained Zoloft for depression (but stopped taking it because of apparent side effects) and apparently was referred to a neurologist.  AR 479, 519.  Further, despite his indigence, Dawdy received prescription medications at Siouxland Community Health Center, including Vicodin and Flexeril.  AR 543.  Thus, absent evidence in the record that Dawdy was denied low-cost or free medical care, his argument that the ALJ erred in discounting his credibility on the basis of failure to seek treatment because he could not afford medical care, including treatment by a neurologist, is unavailing.  *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999); *Murphy*, 953 F.2d at 386-87 (rejecting claim of financial hardship absent evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty).

The ALJ further found that Dawdy's testimony that "he has experienced as many as 40 seizures in a single day" not credible because "[t]he record reflects that he has never described such extreme symptoms to Dr. Taylor, his family doctor."  AR 20.  Indeed, Dawdy's records from Siouxland Community Health Center between 2006 and 2007 reveal that he complained to Dr. Taylor of experiencing seizures on a monthly or even weekly basis, but not to the degree he alleged at the hearing.  An ALJ may decide not to credit fully a claimant's testimony on the basis of inconsistencies between his testimony and the record evidence, including the reports and observations of treating and consultative physicians.  *See McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) (finding that claimant's complaints of disabling pain were inconsistent with repeated observations from treating and consultative physicians that claimant was not in acute pain or distress).  Further, the record reveals that Dawdy's seizure medications were adjusted in response to the frequency of his seizures, and apparently such changes were effective in controlling

his seizures. AR 483, 526, 545A. A claimant's improvement following treatment is a valid reason to discount the claimant's subjective complaints. *See Johnson v. Astrue*, 628 F.3d 991, 995-96 (8th Cir. 2011) (treating physicians' reports that claimant was "doing well" were inconsistent with levels of pain and fatigue claimant described at hearing, which justified ALJ's discounting of claimant's subjective complaints of disabling pain); *Jenkins v. Chater*, 76 F.3d 231, 233 (8th Cir. 1996) (claimant's reported improvement with treatment was proper basis to discount subjective complaints). Accordingly, the ALJ appropriately discounted Dawdy's testimony as being inconsistent with Dr. Taylor's treatment notes.

Furthermore, the ALJ found that Dawdy's activities of daily living belied his claim of disability, finding that Dawdy "gave the impression in his testimony that he rarely leaves his home and then only for medical appointments," but he "told a consulting psychologist in March of 2007 that he enjoys attending sporting events and school activities in which his girlfriend's son is participating. He also stated that he plays drums in a local band and has produced several CD's." AR 20. Inconsistencies between subjective complaints of pain and daily living patterns may diminish credibility. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). In particular, "acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001)) (internal quotation marks omitted). On the other hand, a claimant need not prove he is bedridden or completely helpless to be found disabled. *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005). Rather, "[i]n evaluating a claimant's RFC, consideration should be given to the quality of the daily activities and the ability to sustain activities, interests, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities must also be considered." *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007).

34

In this case, substantial evidence in the record of Dawdy's reported activities supports the ALJ's adverse credibility determination. According to Dawdy, he was a "drummer [and] guitarist" who "[ran] lights and sound" (AR 300), and evidence suggests that this musical endeavor was more than a mere pastime. *See* AR 529 (Dawdy's expression of concern to his doctor after fracturing his right wrist in June 2007 that "he need[ed] to play in his band with the drums in 2 weeks"); AR 526 (Dawdy's report to his doctor in July 2007 that he was "starting to play his drums again, but not a full time line as he used to"). *See Teague v. Astrue*, No. 4:09CV948MLM, 2010 WL 2653472, at *8 (E.D. Mo. June 29, 2010) (finding that, in discrediting claimant's complaints of debilitating pain, ALJ properly considered claimant's daily activities, including playing piano, violin, drums, and guitar), *aff'd*, 638 F.3d 611 (8th Cir. 2011). He further attended sporting events and school activities with his girlfriend's son. AR 20, 551. In addition, contrary to the recommendation of his treating sources, Dawdy operated a motor vehicle on more than one occasion despite his seizure disorder (AR 20, 486, 541, 551). *See Guilliams*, 393 F.3d at 802 ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility."). Although a claimant need not be bedridden before he can be determined to be disabled, Dawdy's "daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints." *Teague*, 2010 WL 2653472, at *8 (collecting cases).

Dawdy contends, however, that the ALJ did not properly question him about his activities at the hearing, citing an ALJ's duty to develop the record. Doc. No. 13 at 18; Doc. No. 21 at 1-2. Although an ALJ has a duty to develop the record fully and fairly, "the relevant inquiry is whether the claimant 'was prejudiced or treated unfairly by how the ALJ did or did not develop the record.'" *Hovenga v. Astrue*, 715 F. Supp. 2d 848, 866 (N.D. Iowa 2010) (quoting *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993)).

Unlike circumstances where a crucial issue is undeveloped or underdeveloped, triggering an ALJ's duty to develop fully the record, *see Samons v. Astrue*, 497 F.3d 813, 819 (8th Cir. 2007), Dawdy, represented by counsel, had the opportunity at the hearing to discuss the extent of his daily living activities. Accordingly, even if the ALJ erred in failing to inquire at the hearing about Dawdy's activities, absent any prejudice, any such error was harmless. *See Shinseki v. Sanders*, 556 U.S. 396, ___, 129 S. Ct. 1696, 1705-06 (2009) (burden is on party attacking agency's determination to show that prejudice resulted from error); *Tommasetti v. Astrue*, 533 F.3d 1035, 1042-43 (9th Cir. 2008) (error is harmless if inconsequential to ultimate nondisability determination); *see also Weiler v. Apfel*, 179 F.3d 1107, 1111 (8th Cir. 1999) (ALJ not required to obtain additional evidence when existing evidence adequately relates claimant's disability).

Finally, the ALJ appropriately found that evidence of Dawdy's drug use in November 2004 and March 2006 belied his report to a counselor in November 2007 that he had been "clean and sober" since 2002 (AR 20-21, 459, 463, 466, 547). *See Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011) ("The ALJ may discredit a claimant based on inconsistencies in the evidence."); *Baldwin*, 349 F.3d at 558 ("In addition, the record indicates that [the claimant] would, at times, maintain that he drank on a regular basis, and then other times indicate that he had not used alcohol or drugs in a considerable amount of time. These inconsistencies support the ALJ's decision to discount [the claimant's] credibility and subjective complaints of pain.").

## 2.    *Credibility of Lay Witnesses*

Dawdy next maintains that the ALJ erred in discounting the credibility of his father and girlfriend. Doc. No. 18-19. "[S]tatements of lay persons regarding a claimant's condition must be considered when an ALJ evaluates a claimant's subjective complaints of pain." *Willcockson v. Astrue*, 540 F.3d 878, 880-81 (8th Cir. 2008) (holding that ALJ's failure to refer in his decision to lay testimony warranted remand); *see also* 20 C.F.R.

§§ 404.1529(c)(3), 416.929(c)(3).  *But see Buckner v. Astrue*, 646 F.3d 549, 559-60 (8th Cir. 2011) (although ALJ did not expressly address claimant's girlfriend's statement in decision, ALJ's error did not require remand because evidence that discredited claimant's claims also discredited girlfriend's claims; ALJ's "arguable deficiency in opinion-writing technique" had no bearing on outcome of claimant's case).

In this case, the testimony of Dawdy's father "merely corroborated" Dawdy's testimony regarding his complaints (AR 334, 618).  *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998).  Thus, the ALJ, having properly discredited Dawdy's subjective complaints, "was equally empowered to reject the cumulative testimony" of his father.  *Id.*; *see also Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996) (determining that, because (1) claimant's mother, sister, and husband were not qualified to render opinion as to claimant's capacity to work, (2) their statements merely corroborated claimant's testimony regarding her activities, and (3) testimony conflicted with medical evidence regarding claimant's functional capabilities, ALJ "had a solid basis for discounting [claimant's] lay witness testimony" and "was not required to make credibility findings as to these witnesses in order to decide their testimony was not entitled to great weight").

As for the testimony of Dawdy's girlfriend, as noted above, the ALJ found that it was not credible and "contrary to actual events" because of inconsistencies between her seizure log and evidence in the record.  AR 21.  Accordingly, these inconsistencies were an appropriate reason supported by substantial evidence in the record for the ALJ to discount the credibility of Dawdy's girlfriend.  *See Grebenick v. Chater*, 121 F.3d 1193, 1200 (8th Cir. 1997) (declining to disturb ALJ's determination that testimony of claimant's husband was not credible "because, in many respects, it was contrary to the medical records in the early years of [claimant's] treatment"); *see also Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (noting that ALJ may discount lay witness testimony by providing "reasons that are germane to each witness").

In sum, the ALJ articulated good reasons to discount the testimony of Dawdy, his father, and his girlfriend that are supported by substantial evidence in the record as a whole.

**B.    *Listed Impairment***

Dawdy contends that the ALJ erred in determining that his mental impairment did not meet or medically equal the criteria of Listing 12.04 because the ALJ found, among other things, that he experienced only moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. Doc. No. 13 at 13-14. According to Dawdy, "Dr. Stokes' report appears to prove otherwise. The ALJ appeared to completely ignore Dr. Stokes' comments which were used by the district court to find him incompetent to stand trial." *Id.* at 13. Dawdy maintains that Dr. Stokes's finding that he "suffers from a high level of paranoia and there is a high risk of harm to himself and others" indicates his marked difficulty in maintaining social functioning. *Id.* (citing AR 556). He further asserts that Dr. Stokes's "comments about [his] severe memory problems which prevent him from remembering things from one day to the next" reveal his marked difficulty in maintaining concentration, persistence, or pace. *Id.* at 14 (citing AR 556).

At step three of the five-step sequential evaluation process, "the Commissioner must determine whether the claimant's impairment meets or equals one of the listed impairments. If the claimant has an impairment that meets the medical criteria of a listed impairment, the claimant is presumptively disabled, and no further inquiry is necessary." *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003) (citation omitted). "The claimant has the burden of proving that his impairment meets or equals a listing. To meet a listing, an impairment must meet all of the listing's specified criteria." *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010) (citation and internal quotation marks omitted); *see also Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical

38

criteria."); *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). "There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) (citing *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003); *Dunahoo*, 241 F.3d at 1037).

The Commissioner's Listing of Impairments describes, for each of the body's major systems, impairments the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Listing 12.04 consists of "paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations)," as well as some "additional functional criteria (paragraph C criteria)." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00. The Commissioner describes the functions of the three types of criteria as follows:

> The criteria in paragraph A substantiate medically the presence of a particular mental disorder. . . .
> The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A.

*Id.*, subs. (A), *Introduction*.

Paragraph B of Listing 12.04 requires that the disorder result in at least two of the following criteria:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4.      Repeated episodes of decompensation, each of extended duration.

*Id.* § 12.04(B).[2]  "'Marked'" means several activities or functions are impaired, or one is impaired such that it interferes seriously with the ability to function independently, appropriately, and on a sustained basis." *Brosnahan v. Barnhart*, 336 F.3d 671, 676 n.2 (8th Cir. 2003) (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)).  "As used in the regulations, 'marked' 'means more than moderate, but less than extreme.'" *Holohan v. Massanari*, 246 F.3d 1195, 1204 n.3 (9th Cir. 2001) (quoting same); *see also* 20 C.F.R. §§ 404,1520a, 416.920a.  When a claimant fails to present sufficient medical evidence demonstrating that his functional limitations are "marked" or rise to such a degree that he is unable to function satisfactorily, an ALJ may conclude that the listing is not satisfied. *See Roberson v. Astrue*, 481 F.3d 1020, 1023 (8th Cir. 2007).

    Dawdy essentially contends that the ALJ erred in not finding that he did not have marked difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  Social functioning refers to a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(2).  It can include a claimant's "ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." *Id.*

    Here, Dr. Lovell, a state agency medical consultant, opined in October 2005 that Dawdy had a severe mental impairment that did not meet or equal a listed impairment, recognizing Dawdy's difficulty with interacting with authority figures but also noting his activities of daily living that included playing drums and guitar and talking with others.

---

[2] Listing 12.04 allows only the paragraph C criteria to be satisfied, as an alternative to satisfying both A and B.  *Id.* § 12.04 ("The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.").  Because Dawdy does not contend the ALJ should have considered his impairments under the paragraph C criteria of Listing 12.04, the court will omit discussion of those criteria here.

AR 394.  On the basis of Dawdy's daily living activities and his treatment history, Dr. Lovell concluded that his mental impairment only moderately impacted his ability to complete regularly a typical work week (AR 394).  *See* 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) (ALJs "must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether [the claimant is] disabled").

Furthermore, "[c]oncentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(3).  "Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings." *Id*.  "In addition, major limitations in this area can often be assessed through clinical examination or psychological testing.  Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence." *Id*.  "On mental status examinations, concentration is assessed by tasks such as having [the claimant] subtract serial sevens or serial threes from 100.  In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits." *Id*.

In this case, while recognizing Dawdy's slowed thought processes and difficulties with his memory, Dr. Lovell found that Dawdy was able to understand and remember instructions and procedures for basic and detailed tasks on the basis of his living activities and previous work as a cook.  AR 394.  Further, according to Dr. Lovell, Dawdy's activities and his mental status supported a "moderate variability of concentration." AR 394.  In this regard, Dawdy's previous employer noted in May 2005 his adequate ability to concentrate and to remain on task (AR 246), and testing by consultative examiner Dr. Baker in September 2005 indicated Dawdy's ability "to produce serial sevens at a fair rate

without error." AR 520.   Substantial evidence thus supports Dr. Lovell's opinion regarding Dawdy's ability to maintain concentration.

Despite Dawdy's assertion that his mental impairment meets or equals Listing 12.04, it is not the court's function on judicial review to reweigh the evidence or to review the factual record *de novo*. *Baldwin*, 349 F.3d at 555.   Rather, the court must affirm the Commissioner's decision if it is supported by substantial evidence in the record – *even if* the court would have weighed the evidence differently, or substantial evidence would support an opposite decision. *See, e.g.*, *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) ("If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits."); *Goff*, 421 F.3d at 789; *Sangel v. Astrue*, 785 F. Supp. 2d 757, 780 (N.D. Iowa 2011).   In light of substantial evidence to support the ALJ's finding that Dawdy did not have an impairment or combination of impairments that meets or equals any of the impairments in the Listing of Impairments, including Listing 12.04, Dawdy's argument to the contrary is unavailing.

## C.   *Global Assessment of Plaintiff's Functioning*

As noted above, Dawdy was diagnosed with a GAF score of 45. AR 521.   The VE testified that an individual with such a GAF score would not be able to sustain employment. AR 632.   Dawdy asserts that the ALJ erred in failing to address his GAF scores below 50. Doc. No. 13 at 15.   The Commissioner maintains that a claimant's GAF score below 50 does not require automatically a finding of disability. Doc. No. 19 at 24.

This court previously analyzed the significance of the GAF score, *see Evers v. Astrue*, No. C09-4018-MWB, 2010 WL 3892230, at *21-24 (N.D. Iowa Sept. 28, 2010), before noting that, "[w]hile . . . the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' the GAF scores may still be

used to assist the ALJ in assessing the level of a claimant's functioning." *Halverson*, 600 F.3d at 930-31 (citation omitted).

The court agrees that the ALJ's failure to discuss Dawdy's GAF scores in the administrative decision warrants remand. Courts differ in their opinions of whether a GAF score of 50 or below indicates an inability to work. *Compare Campbell v. Astrue*, 627 F.3d 299, 306-07 (7th Cir. 2010) ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability. . . . A GAF rating of 50 does not represent functioning within normal limits. Nor does it support a conclusion that [the claimant] was mentally capable of sustaining work.") *with Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) ("[The claimant] complains that the mental RFC determination must be defective because she has been rated 45-50 on the [GAF] scale. Even assuming GAF scores are determinative, the record supports a GAF in the high 40s to mid 50s, which would not preclude her from having the mental capacity to hold at least some jobs in the national economy."). In any event, according to the VE in this case, GAF scores of 50 and below render an individual unable to work. The ALJ's decision is silent as to why the ALJ rejected this testimony. Such an omission is not a deficiency in opinion-writing technique that has no effect on the outcome of this case, *Willcockson*, 540 F.3d at 880, because if the VE's testimony is accepted as true, then Dawdy is incapable of working. The ALJ may have believed that evidence in the record, including Dawdy's activities of daily living, indicates a level of functioning that belies his GAF scores. Alternatively, the ALJ may have found that the opinions of Dawdy's medical sources regarding his GAF scores are inconsistent internally or with other evidence. *See Perkins v. Astrue*, 648 F.3d 892, 897-98 (8th Cir. 2011). The ALJ, however, made no such findings, and the court can only consider the rationale relied upon by the agency when reviewing an agency's decision. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001) (citing *SEC v. Chenery Corp.*, 318

U.S. 80, 63 S. Ct. 454 (1943)).  Although an ALJ need not discuss all evidence presented, the ALJ must explain why significant probative evidence has been rejected.  *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam).  Accordingly, the undersigned recommends that this case be remanded to afford the ALJ the opportunity to do so.

### D.    *Weight of Treating Opinions*

Dawdy contends that the ALJ failed to give appropriate weight to the opinions of his treating doctors, including Dr. Taylor.  Doc. No. 13 at 15-16.  The Commissioner asserts that the ALJ's assessment of Dawdy's RFC was consistent with Dr. Taylor's restrictions as stated in his April 2008 opinion.  Doc. No. 19 at 26.

"The ALJ is charged with the responsibility of resolving conflicts among medical opinions."  *Finch*, 547 F.3d at 936.  "A treating physician's opinion is generally given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotation marks omitted); *see also* 20 C.F.R. § 416.927(d)(2). "When deciding how much weight to give a treating physician's opinion, an ALJ must . . . consider the length of the treatment relationship and the frequency of examinations.  When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so."  *Brown v. Astrue*, 611 F.3d 941, 951-52 (8th Cir. 2010) (citation omitted) (internal quotation marks omitted).  In this regard, "[t]he statements of a treating physician may be discounted . . . if they are inconsistent with the overall assessment of the physician or the opinions of other physicians, especially where those opinions are supported by more or better medical evidence."  *Teague*, 638 F.3d at 615.  "[A] treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the

44

ultimate determination of disability." *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (citation omitted); *see* 20 C.F.R. §§ 404.1527(e)(1), (3), 416.927(e)(1), (3).

By contrast, "the opinions of nonexamining sources are generally, but not always, given less weight than those of examining sources." *Willcockson*, 540 F.3d at 880 (citing 20 C.F.R. § 404.1527(d)(1)); *see also* 20 C.F.R. § 416.927(d)(1). Rather, "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the Commissioner] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). The Commissioner "will evaluate the degree to which these opinions consider all of the pertinent evidence in [the claimant's] claim, including opinions of treating and other examining sources." *Id.*; *see also id.* §§ 404.1527(f), 416.927(f) (discussing rules for evaluating non-examining state agency opinions).

In this case, the Commissioner correctly points out that Dr. Taylor's opinion that Dawdy would be "an appropriate candidate for Social Security disability benefits" is entitled to no weight. In any event, in assessing Dawdy's RFC, the ALJ incorporated Dr. Taylor's opinion that Dawdy should avoid operating heavy equipment, driving, and heights. However, the ALJ did not discuss her apparent rejection of Dr. Taylor's opinion that Dawdy "would be likely to miss two or more days of work per month on an unscheduled basis" (AR 577), which, according to the VE, would preclude Dawdy from competitive employment. AR 631. Again, the ALJ may have found that Dr. Taylor's opinion was inconsistent with other evidence, *see McCoy*, 648 F.3d at 616-17, or was based on Dawdy's subjective complaints that the ALJ properly discounted, *see Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996), but the ALJ's decision fails to address any consideration of Dr. Taylor's opinion that Dawdy likely would miss at least two days of work per month. Because "[t]he regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician," the undersigned recommends

45

that this case be remanded for the ALJ to explain the weight given to Dr. Taylor's opinion regarding Dawdy's work absences. *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).[3]

### Recommendation

For the reasons discussed above, the court finds that the Commissioner's decision is neither supported by substantial evidence in the record as a whole nor based on proper legal standards. Accordingly, IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision be **reversed**, this case be **remanded** for further proceedings consistent with this report, and judgment be entered in favor of Dawdy and against the Commissioner.

Objections to the Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

---

[3] Dawdy also contends to no avail that the ALJ erred in finding that he could perform medium-level work. Doc. No. 13 at 14-15. Dawdy points to no evidence of exertional limitations that would preclude his performance of medium-level work. In fact, Dawdy's claim of disability is based on nonexertional limitations resulting from his seizure disorder. *See Williams v. Bowen*, 844 F.2d 748, 752 (10th Cir. 1988) ("Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain."). In any event, on the basis of the VE's testimony, the ALJ found that Dawdy could perform work at the light exertional level that exists in significant numbers in the national economy. AR 22, 626-30.

**IT IS SO ORDERED.**

**DATED** this 25th day of October, 2011.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT